**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Angel Alberto Garcia,                    )   No. CV-07-999-PHX-LOA
                                         )
                  Plaintiff,             )   **ORDER**
                                         )
vs.                                      )
                                         )
Qwest Corporation, a corporation,        )
                                         )
                  Defendant.             )
                                         )
_____  )

      Defendant Qwest Corporation ("Qwest") moves for summary judgment on Plaintiff's claims of discrimination due to Plaintiff's alleged wrongful termination of his employment with Qwest in violation of the Americans with Disabilities Act ("ADA"). (docket # 40)  Specifically, Angel Alberto Garcia ("Garcia" or "Plaintiff") alleges that Qwest failed to provide him a reasonable accommodation for his mental disability, wrongfully retaliated against him for requesting a reasonable accommodation for his disability and subjected him to a hostile work environment because of his disability.[1] (docket # 6 at ¶ 18, 32)  After considering the parties' briefings and the relevant case law, the Court concludes there is no genuine dispute of material fact and Qwest is entitled to judgment as a matter of law. The Court will grant Qwest's Motion and terminate this case.

---

[1] Because Plaintiff is *pro se*, the Court liberally construes his Amended Complaint. (docket # 6)  *Haines v. Kerner*, 404 U.S. 519, 520 (1972) ("[u]nder the allegations of the *pro se* complaint, . . . we hold to less stringent standards than formal pleadings drafted by lawyers[.]") (citations omitted); *Weilburg v. Shapiro*, 488 F.3d 1202, 1205 (9th Cir. 2007).

**BACKGROUND**

In February 2004, Qwest hired Garcia as a sales consultant in Phoenix. (Defendant's Statement of Facts ("DSOF") ¶ 1; docket # 41 at 1)  In February 2006, Garcia's title changed to Sales and Service Consultant, assisting customers over the phone in purchasing telephone, wireless and internet services. *Id.* at ¶¶ 1-2. Garcia's employment was governed by the collective bargaining agreement negotiated between Qwest and Garcia's union, the Communications Workers of America. *Id.* at ¶¶ 3-4.  Like all Qwest employees, Garcia was required to follow Qwest's Code of Conduct and policies that governed the execution of Garcia's job duties and conduct within the office. *Id.* at ¶¶ 4-6. Garcia acknowledges that use of obscene or offensive language in the workplace is, and was at all relevant times, prohibited and to do so violated Qwest's Code of Conduct.  *Id.* at ¶ 10.

In September 2006, Qwest announced that it was closing its Phoenix sales office. While on a short leave of absence due to the birth of his son on September 10, 2006, Garcia received a call from a co-worker, informing him of Qwest's announcement to close the Phoenix office.  *Id.* at ¶¶ 11-13. Garcia attributes the onset of his mental health symptoms in October, 2006 to this call and information.  *Id.*

From November 8, 2005 to February 7, 2006, Garcia took a Qwest- approved leave from work, called Short Term Disability, due to a discrete episode of depression.  *Id.* at ¶ 30. During this 13-week period, Garcia consulted with a mental health therapist, Trudy Sloane-Farrell[2] ("Sloane-Farrell") on approximately "eight to ten visits."  *Id.* at ¶ 31.  According to Garcia's and Sloane-Farrell's deposition testimony, Garcia recovered from his "episodic occurrence of serious depression" and returned to work part-time on February 7, 2006, and full-time on February 15, 2006, with no work restrictions. *Id.* at ¶ 32; DSOF, Exhibit O, pp. 20-22; Plaintiff's Statement of Facts ("PSOF"), Exhibit B, at 90. Upon his return to work and feeling like he could do his job, Garcia began reporting to Jesus Martinez ("Martinez"), his new

---

[2] The Court credits Sloane-Farrell as a mental health expert pursuant to Rule 702, Fed.R. Evid., for purposes of this dispositive motion.

1   supervisor.  (DSOF ¶ 33; PSOF, Exhibit B, at 90)  Qwest contends that Martinez had no

2   knowledge that Garcia was previously diagnosed with depression, suffered from any physical

3   or mental impairment, or was limited in any way in his ability to perform his job duties.  (DSOF

4   at ¶ 33)

5            After his return to work on February 7, 2006, Garcia testified he was "better"

6   and did not have any appointments with Sloane-Farrell until the evening of October 10, 2006,

7   the day before Garcia was fired. *Id.* at ¶ 34. At the October 10, 2006 office visit and in response

8   to Garcia's request to be taken off the phones so he could deal with the stress he was feeling at

9   work, Sloane-Farrell provided Garcia with a note that he be taken off the phones for one week

10  so he could "resolve a stressful situation." *Id.* at ¶ 36. According to her testimony,

11  Sloane-Farrell did not diagnose Garcia with depression, but rather, noted Garcia was "very

12  upset" due to "[s]ome definite incidents that happened at work[.]" Garcia told her his

13  department was closing, he thought he was going to lose his job and he was getting "very

14  stressed . . . [E]verybody was really angry at him because he snitched about what was going on

15  there." (DSOF, Exhibit O, pp. 24)  "He was just feeling so stressed that he couldn't focus and

16  he couldn't be on the phone." *Id.*  Garcia asked her: "Trudy, would you just take me off the

17  phones until we can deal with it." *Id.* at 24-25.  Due to his "perceived unfairness at [his] job .

18  . . that three people who didn't pass the test were going to be hired and he wasn't when he

19  passed the test," Sloane-Farrell provided Garcia with a note to be off the phones for one week

20  so he could "resolve a stressful situation." (DSOF, ¶ 36; Exhibit O at 26) By taking Garcia off

21  the phone, Sloane-Farrell "was basically saying, 'Just don't make him do his job for one week

22  so we could resolve this stressful situation." (DSOF, Exhibit O at 28)  Significantly, however,

23  Sloane-Farrell testified that when she saw Garcia in October, 2006, it was her medical opinion

24  that Garcia "should be able to work somewhere, that he wasn't so depressed like he was back

25  in '05-'06." *Id.* at 35-36.

26            Aside from the October 10, 2006 note from his therapist Sloane-Farrell, DSOF,

27  Exhibit P; docket # 41-5 at 85, the few medical records the parties provided from his first

28  depressive episode (November 7, 2005 to January 31, 2006) before returning to work in

February, 2006, and Garcia's and Sloane-Farrell's deposition testimony, Garcia has presented no medical evidence to support his claim that he is disabled within the meaning of the ADA other than his own non-expert opinions.

The parties agree that Garcia was terminated from his employment on October 11, 2006. *Id.* at ¶¶ 19-23; docket # 6 at 27. The parties disagree, however, whether Garcia was disabled under the ADA standard and whether his employment was terminated because of his disability. Qwest contends Garcia was fired on October 11, 2006 after a series of earlier warnings for tardiness, insubordination, unauthorized use of personal cell phone instead of taking calls from customers, lack of "professionalism, [poor] call handling and slam cram[,]"[3] DSOF, Exhibit N, Notice of Dismissal; Exhibit A at 109; Exhibits G, H, I, J, K, L, and M, and, finally, for violating Qwest's Code of Conduct by using profanity in the workplace.[4] (DSOF, ¶¶ 20-22) Except for its disability aspect, Qwest does not dispute that Garcia was a "qualified individual"[5] for his job as a sales consultant or his employment termination constitutes an adverse employment action.[6]

Garcia's Amended Complaint alleges he "was subjected to unlawful discriminatory practices on the basis of his disability" and was wrongfully terminated from his

---

[3] "Slamming" and "cramming" is a sale's person adding things to a client's account that the client did not order. (PSOF, Exhibit B, at 52; DSOF, Exhibit A at 52-53)

[4] See, October 11, 2006 email complaints from Garcia's Qwest co-workers, Mayra Acosta and Irene Salazar, to supervisor Martinez, complaining of Garcia's language, disruptive behavior and negative attitude. (DSOF, Exhibits B-2, 65-66)

[5] The Act defines a "qualified individual" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

[6] Qwest also argues that Martinez did not know that Garcia was disabled because "Garcia never advised Mr. Martinez that he needed to be taken off the phones to accommodate a purported disability." (docket # 42 at 13) Qwest claims that Garcia's expressed frustration with being taken off the phones and his difficulty with stress is "insufficient to trigger Qwest's obligation to engage in the interactive process[,]" citing *Coley v. Grant County*, 36 Fed. Appx. 242, 244 (9th Cir. 2002). *Id.* The Court finds a question of fact exists whether Martinez knew Garcia had a disability.

1   employment with Qwest. (docket # 6 at 1)  Garcia identifies his disability as a "mental disability

2   [that] substantially limited [him] in at least one major life activity." *Id*. at ¶ 6. Garcia contends

3   that Qwest's management previously accommodated his disability by providing him job

4   "adjustments," "some slight modification of general methods to perform [Garcia's] job" as he

5   describes them, until the February, 2006 assignment of Martinez as Garcia's new supervisor.

6   *Id*. at 13-16. Garcia, however, does not identify the major life activity that he is substantially

7   limited in performing and the degree to which he may be so limited.

8               After Martinez became his supervisor, Garcia claims his requests for an

9   accommodation to be taken off the phone were ignored by Martinez and he was subjected to

10  "harassment by managers [Martinez] and coworkers because of his disability." *Id*. at ¶ 18. In

11  addition to other offensive remarks, Garcia  alleges that on October 10, 2006 and in front of

12  other co-workers, Martinez told him: "People like you are f--king the company, you should do

13  me and all of us a favor and quit. You don't have an (sic) disability, you are just a little girl get

14  back to work." *Id*. at ¶ 19.  Garcia testified at his deposition that "around October 10, 2006,"

15  he asked Martinez to be taken off the phones because Garcia's "anxiety and depression was

16  (sic) just overwhelming, and I couldn't handle [the pressure]."  (PSOF, Exhibit B, at 63-64;

17  docket # 44 at 12-13 of 39)  "I was feeling the symptoms that I had felt the prior time I went on

18  disability." *Id*. at 77. Professing to be on the verge of tears, Garcia testified that Martinez

19  "responded negatively by saying '[you don't] have a disability . . . I want to see a doctor's note

20  if you're going to pull this . . . crap.' " *Id*.  Garcia contends that shortly thereafter, he

21  complained of the disability harassment to several union stewards and Qwest's management and

22  the harassment increased in "frequency and severely (sic)."  (docket # 6 at 25)  Specifically, he

23  testified that some of his co-workers didn't want to talk to Garcia because they thought he was

24  a "snitch" and  indirectly called him a "cry bab[y] and whiny bitch[.]" (PSOF, Exhibit B, at 78-

25  79)  Garcia alleges that "[o]n October 11, 2006, [he] was terminated by Jesus Martinez for

26  purported violation of the Code of Conduct, however, [Garcia denies he] commit[ted] the

27  offense."  (docket # 6 at 27)

28               On November 17, 2006, Garcia filed a Charge of Discrimination against Qwest

1  with the EEOC, alleging discrimination based upon his disability, identified by Garcia as

2  "[d]epression, axiety (sic)"[7] and also claiming "retaliation for [his] request for a reasonable

3  accommodation" in violation of the ADA.  (docket # 1, Exhibit 3; docket # 49 at 9, Defendant's

4  Reply, Exhibit S, EEOC Intake Questionnaire)  Garcia received a right-to-sue letter, date-

5  stamped  February 22, "2006,"[8] on February 26, 2007.  (docket # 6 at ¶¶ 31-32)  Garcia filed

6  this lawsuit *pro se* on May 17, 2007. (docket # 1)  His Amended Complaint was filed on June

7  6, 2007.  (docket # 6)

8          Qwest denies that it violated the ADA and alleges that Garcia was "not

9  disabled, nor did he request an accommodation for an alleged disability, as defined by the ADA,

10 during the relevant time period."  (docket # 19 at ¶ 14)  Qwest's Statement of Facts indicates

11 that "termination of Mr. Garcia's employment was the result of his lengthy history of

12 inappropriate and unsatisfactory performance and not the result of any type of discrimination,

13 harassment or retaliation." (docket # 41, ¶ 24)  Qwest moves for summary judgment on the

14 following grounds:

15         1. Garcia has not sufficiently established that he was "disabled" as defined by

16 the ADA when his employment was terminated on October 11, 2006;

17         2. Even if he were able to establish a *prima facie* case of discrimination, which

18 Qwest denies that he can, Garcia was terminated for a legitimate, nondiscriminatory reason that

19 was not a pretext for unlawful discrimination;

20         3. Garcia cannot establish that his termination was the result of unlawful

21 retaliation; and

22         4. Garcia was not subjected to a hostile work environment (harassment)

23

24         [7] In his March 14, 2008 deposition, Garcia testified he suffers from "extreme anxiety and
   paranoia and depression[,]" difficulty sleeping, constant fears and phobias which he asserts are
25 symptoms of his mental health condition. DSOF, ¶ 42; Exhibit A, Garcia Depo., 27:14-16.
   Garcia's EEOC Intake Questionnaire, however, mentions only  "[d]epression, axiety (sic)" as
26 his disability.  (docket # 49 at 9, Defendant's Reply, Exhibit S, EEOC Intake Questionnaire)

27         [8] The date "2006" is likely a typographical error because Qwest admits that the "Right
28 to Sue letter was issued on February 22, 2007."  (docket # 19 at ¶ 32)

1   because of his disability.

2   (docket # 42)

3           Garcia's Response to Qwest's Motion for Summary Judgment claims that "he

4   is disabled as defined by the ADA[;]" that he has "establish[ed] a prima facie case under the

5   ADA[,] and that "there is clearly a genuine issue of material fact . . . that defendant is liable and

6   trial is better suited to determine this outcome." (docket # 46 at 5)   Garcia's unverified

7   Statement of Facts, identified as "Plaintiff's Response to Defendant Qwest Corporation's

8   Motion for Summary Judgment," asserts that Garcia "is a person living with a mental disability

9   resulting in Clinical depression and also Anxiety." (docket # 47, ¶ 28 at 5)  Garcia's support of

10  his mental disability in the record is Garcia's unverified First Amended Complaint, docket # 6,

11  and its attachments,  "[d]ocket #6 and attached as Exhibit a, b, c, d)[,]"  and the 39 pages of

12  attachments, marked  as Exhibits A through D, to Garcia's first Response to Qwest's Motion

13  for Summary Judgment.[9]  Garcia's non-labeled attachments to his First Amended Complaint

14  are: (1) Qwest's February 6, 2006 one-page letter to Garcia regarding "Approval of Short-Term

15  Disability Rehabilitation Benefits," which the Court will designate "Exhibit A" for purposes of

16  this Order; (2) a two-page Mental Health Functional Capacity Evaluation of Garcia by Trudy

17  Sloan-Farrell, a "psychiatric social worker," dated November 17, 2005 (Exhibit B, 1-2); a two-

18  page FMLA notification letter for employee (Garcia), signed by Trudy Sloan-Farrell, dated

19  November 17, 2005 (Exhibit C, 1-2); and a November 8, 2005 off-work note signed by Heidi

20  Pence, a Psychiatric Nurse Practitioner, stating: "Angel Garcia is currently unable to work

21  related to Depression Disorder. His tentative return to work date is 11/22/05."  (docket # 6 at

22  9-14)

23          Garcia does not provide the Court, either by affidavit or in some other

24  acceptable format per Rule 56, FED.R.CIV.P., a psychiatric, psychological or medical opinion

25  _____

26          [9] Garcia's first Response, docket # 44, was stricken *sua sponte* without prejudice due
    Garcia's numerous violations of the Local Rules. (docket # 45)  The Court allowed, however,
27  Garcia to reference in his subsequent Response, docket # 46, the 39 pages of exhibits which
28  were not stricken on September 2, 2008. *Id.*

as to the nature and severity of Garcia's "mental disability," its permanent or long-term prognosis, how his mental condition impacted his job at Qwest, what accommodations, if any, Qwest should have provided to Garcia for him to do his job in October, 2006, and whether Garcia's condition was resolved or reoccurred when Garcia was terminated on October 11, 2007. In fact, the testimony of his therapist, Sloane-Farrell, is contrary to Garcia's argument. In her opinion, Garcia should have been able to work in October, 2006. (DSOF, Exhibit O, at 35-36; see p. 3 of this Order)

Qwest's Reply correctly points out that, in addition to not properly serving Qwest with both his initial Response, docket # 44, and his refiled Response, docket #46,[10] and "Statement of Facts," titled "Response to Defendant Qwest Corporation Motion for Summary Judgment," docket # 47,  Garcia fails to include a single reference to his "Statement of Facts" to support his factual assertions in his Response as required by Local Rule ("LRCiv") 56.1(e). Furthermore, Garcia's unverified Statement of Facts, docket # 47, completely fails to comply with LRCiv 56.1(b) and this Court's July 2, 2008 Order, docket # 45. Instead of setting forth correspondingly numbered paragraphs disputing Qwest's Statement of Facts and referencing admissible portions of the record to support his claims, Garcia's Statement of Facts simply restates the conclusory allegations of his Amended Complaint.

Unfortunately, Garcia's procedural failures, typically seen in *pro se* cases, significantly increase a district court's burden to determine a *pro se* litigant's admissible evidence in order to properly rule upon dispositive motions. It places a trial judge in the unenviable position of either applying the rules evenly to all parties, represented or not, and risking perhaps an unjust substantive result or dramatically increasing a busy trial judge's limited time to scour the record in search for admissible evidence to support a *pro se* litigant's claims. The Court opts for the more difficult, higher road and will not summarily grant Qwest's dispositive motion based on Garcia's significant procedural failures and Local Rule violations.

---

[10] See, docket # 49, at 2 n. 2. Fortunately, Qwest sustained no prejudice because its counsel properly and timely monitored, and received copies from, the Court's electronic docket.

## SUMMARY JUDGMENT STANDARD

A district court must grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the nonmoving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Substantive law determines which facts are material. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). In addition, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. The dispute must be genuine, that is, "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex*, 477 U.S. at 323-24. Summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id*. at 322. The moving party need not disprove matters on which the opponent has the burden of proof at trial. *Celotex*, 477 U.S. at 323.

The party opposing summary judgment "may not rest upon the mere allegations or denials of [the party's] pleadings, but. . . must set forth specific facts showing that there is a genuine issue for trial." FED.R.CIV.P. 56(e); *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (the nonmoving party must "identify with reasonable particularity the evidence that precludes summary judgment."). There is no issue for trial unless there is sufficient evidence favoring the nonmoving party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249-50. The evidence in the record, however, must be viewed in the light most favorable to the nonmoving party. *Devereaux v. Abbey*, 263 F.3d 1070, 1074 (9th Cir. 2001) (en banc); *Freeman v. Arpaio*, 125 F.3d 723, 735 (9th Cir. 1997) ("In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the non-moving party.").

A motion for summary judgment may be opposed by any of the evidentiary materials listed in Rule 56(c), FED.R.CIV.P.,"except the mere pleadings themselves[.]" *Celotex*, 477 U.S. at 324. Federal Rule of Civil Procedure 56(c) authorizes the district court to consider depositions, answers to interrogatories, admissions and affidavits in considering a motion for summary judgment. Fed. R. Civ. P. 56(c). In the Ninth Circuit, district courts may consider specific facts admissible in evidence in a verified complaint based on personal knowledge in opposition to a motion for summary judgment. *Schroeder v. McDonald*, 55 F.3d 454, 460 (9th Cir. 1995). Although district courts hold a *pro se* litigant to "less stringent standards than formal pleadings drafted by lawyers," *Haines v. Kerner*, 404 U.S. 519, 520 (1972), and will not dismiss a complaint due simply to inartful pleadings, every plaintiff, whether represented or not, opposing summary judgment must present "significant probative evidence tending to support the complaint" to defeat summary judgment. *Anderson*, 477 U.S. at 248-49. A *pro se* plaintiff is not entitled to rely on mere allegations in his unverified complaint in opposing a defendant's motion for summary judgment. See, e.g., *Lew v. Kona Hosp*., 754 F.2d 1420, 1423-24 (9th Cir. 1985).

Finally, facts which may establish a genuine issue of fact must *both* be in the district court's file and set forth in the nonmoving party's response. *Carmen v. San Francisco Unified School District*, 237 F.3d 1026, 1029 (9th Cir. 2001). "[I]t is not [the appellate court's] task, or that of the district court, to scour the record in search of a genuine issue of triable fact." *Keenan*, 91 F.3d at 1279.

## ADA DISABILITY DISCRIMINATION

**1. ADA's definition of "disability"**

Title I of the ADA, 42 U.S.C. §§ 12101-12213, prohibits discrimination in employment against a qualified individual because of his or her disability.[11] *Weyer v. Twentieth*

---

[11] The Court notes that Congress recently amended the ADA's definition of the term "qualified individual with a disability" as a part of the ADA Amendments Act of 2008. Pub.L. No. 110-325, § 4, 122 Stat. 3553 (2008). President George W. Bush signed this legislation into law on September 25, 2008 but it does not become effective until January 1, 2009.

*Century Fox Film Corp.*, 198 F.3d 1104, 1108 (9th Cir. 2000).  Under the ADA, an employer cannot discriminate "against a qualified individual with a disability because of the disability of such individual with regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." *Id.*; 42 U.S.C. § 12112(a).[12]

　　　　To establish a *prima facie* case of discrimination under the ADA, a plaintiff must demonstrate that: (1) he is "disabled" within the meaning of the ADA; (2) he is a qualified individual able to perform the essential functions of the job with or without reasonable accommodation; and (3) he was subject to an adverse employment action based on his disability.  *Bates v. United Parcel Service, Inc.*, 511 F.3d 974, 988, (9th Cir. 2007); *Nunes v. Walmart Stores, Inc.*, 164 F.3d 1243, 1246 (9th Cir. 1999).  An employer discriminates against a qualified individual with a disability by "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the [employer]." 42 U.S.C. § 12112(b) (5)(A); *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 396 (2002).

　　　　Not all individuals having what might commonly be perceived as physical or mental disabilities are protected by the ADA. "Merely having an impairment does not make one disabled for purposes of the ADA." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 195 (2002) (citing 42 U.S.C. § 12102(2)(A) (1994 ed.)). "The ADA defines 'disability' with specificity as a term of art. Hence, a person may be 'disabled' in the ordinary usage sense, or even for purposes of receiving disability benefits from the government, yet still not be 'disabled' under the ADA." *Sanders v. Arneson Prods., Inc.*, 91 F.3d 1351, 1354 n. 2 (9th Cir. 1996) (temporary psychological impairment that lasted less than four months not a disability under the

---

[12] "Covered entities" include employers, like Qwest, with more than 25 employees. 42 U.S.C. §§ 12111(2), 12111(5)(A). Qwest does not dispute it is such an employer.

1  ADA).

2          The ADA defines "disability" as "(A) a physical or mental impairment that

3  substantially limits one or more of the major life activities of such individual; (B) a record of

4  such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. §

5  12102(2). Garcia's claim is based on the first prong ("actually disabled") of this definition.

6          Courts follow a three-step analysis in determining whether a plaintiff is

7  "actually disabled" under the ADA's definition of disability. *Bragdon v. Abbott*, 524 U.S. 624,

8  631 (1998). First, a court must ascertain whether a plaintiff has a "physical or mental

9  impairment" as defined by the ADA. *Id.*  Second, a court must identify the life activity upon

10  which plaintiff relies (walking, seeing, hearing, etc.) and determine whether it constitutes a

11  major life activity under the ADA. *Id.* Third, a court must decide whether a plaintiff's

12  impairment "substantially limits"[13] his ability to perform the identified major life activity. *Id.*

13

14  ─────────────

    [13] "Substantially limits" is defined as:

15

16          i) Unable to perform a major life activity that the average person in the general
            population can perform; or

17

18          ii) Significantly restricted as to the condition, manner or duration under which an
            individual can perform a particular major life activity as compared to the

19          condition, manner, or duration under which the average person in the general
            population can perform that same major life activity.

20

21  29 C.F.R. § 1630.2(j)(1) (2006). The regulations further provide that whether someone is
    substantially limited in a major life activity is to be examined using such factors as:

22

23          i) The nature and severity of the impairment;

24          ii) The duration or expected duration of the impairment; and

25          iii) The permanent or long term impact, or the expected permanent or long term
            impact of or resulting from the impairment.

26

27  29 C.F.R. § 1630.2(j)(2) (2006).

28

at 631, 639; *Gribben v. United Parcel Service, Inc.*, 528 F.3d 1166, 1169 (9ᵗʰ Cir. 2008).

A plaintiff bears the burden of proving that he or she is disabled within the meaning of the ADA. *Wong v. Regents of University of California*, 410 F.3d 1052, 1063 (9ᵗʰ Cir. 2005); *Thornton v. McClatchy Newspapers, Inc.*, 261 F.3d 789, 794 (9th Cir. 2001), *supplemented at* 292 F.3d 1045 (9th Cir. 2002)). "[W]hether a person has a disability under the ADA is an individualized inquiry" and must be done on a case-by-case basis. *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 483 (1999).

Aside from an exception not relevant here, the familiar burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies to discrimination claims based on disability.[14] *Raytheon Co. v. Hernandez*, 540 U.S. 44, 49-50 (2003) (applying *McDonnell Douglas* burden shifting framework to ADA disability discrimination claim). Under this burden-shifting analysis, a plaintiff must first establish a *prima facie* disability discrimination claim. Specifically, Garcia has the initial burden to prove a *prima facie* case of discrimination that he: (1) is disabled within the meaning of the ADA; (2) is qualified for the job; and (3) suffered an adverse employment action because of [his] disability. *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1087 (9th Cir. 2001) (citing *Sanders*, 91 F.3d 1351 at 1353). The requisite degree of proof necessary to establish a *prima facie* case of discrimination on summary judgment "is minimal and does not even need to rise to the level of a preponderance of the evidence." *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994); *Livingston v. Fred Meyer Stores*, 567 F.Supp.2d 1265, 1269-70 (D. Or. 2008).

At the summary judgment stage, a plaintiff need only offer evidence which "gives rise to an inference of unlawful discrimination." *Wallis*, 26 F.3d at 889 (citation omitted). Ninth Circuit precedent also supports the principle that a plaintiff's testimony alone may suffice

---

[14] The *McDonnell Douglas* burden-shifting analysis does not apply where "the employer acknowledges reliance on the disability in the employment decision." *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1093 n. 10 (9th Cir. 2001). In such a case, once the plaintiff establishes a *prima facie* case, "the employer bears the burden of showing that the disability is relevant to the job's requirements." *Id.*

to establish a genuine issue of material fact. In *Head v. Glacier Northwest*, 413 F.3d 1053, 1060 (9th Cir. 2005), the Court stated:

> *Fraser* [*v. Goodale*, 342 F.3d 1032, 1037 (9th Cir.2003)] supports the principle that a plaintiff's testimony may suffice to establish a genuine issue of material fact. Consequently, it follows that comparative or medical evidence at the summary judgment stage is not required. We hasten to add that our holding in no way impugns our longstanding precedent that conclusory declarations are insufficient to raise a question of material fact[, citing *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997)].

*Head*, 413 F.3d at 1059.

If Garcia establishes a *prima facie* claim, the burden then shifts to Qwest to establish a legitimate, non-discriminatory reason for its actions. If Qwest proffers such a reason, the burden shifts back to Garcia to show that Qwest's reason is actually a pretext for discrimination. *Coghlan v. Am. Seafoods Co. LLC.*, 413 F.3d 1090, 1095 (9th Cir. 2005) ("[W]hen the plaintiff relies on circumstantial evidence, that evidence must be 'specific and substantial' to defeat the employer's motion for summary judgment."); *Atwood v. Consolidated Elec. Distributors, Inc.*, 231 Fed. Appx. 767, 768 (9th Cir. 2007).

**A. Mental Impairment**

The Ninth Circuit and a number of other circuits recognize that depression and anxiety may qualify as mental impairments under the ADA. *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1088 (9th Cir. 2001) ("[S]tress and depression can be considered mental impairments . . . under the ADA." ) (citations omitted), *cert. denied* , 534 U.S. 888 (2001); *Mustafa v. Clark County Sch. Dist.*, 157 F.3d 1169, 1174-75 (9th Cir. 1998); *Ogborn v. United Food & Commercial Workers Union, Local No. 881*, 305 F.3d 763, 767 (7th Cir. 2002) ("Major depression can constitute a disability under the ADA." ); *Krocka v. City of Chicago*, 203 F.3d 507, 512 (7th Cir. 2000) ("Because [the employee's] severe depression is a medical condition diagnosed by a health professional, it qualifies as an impairment under the ADA."); *Criado v. IBM Corp.*, 145 F.3d 437, 442 (1st Cir. 1998) (citations omitted); *Pritchard v. S. Co. Servs.*, 92 F.3d 1130, 1132 (11th Cir. 1996) ("Depression has been held to constitute a mental impairment."), *amended on other grounds by* 102 F.3d 1118 (11th Cir. 1996)), *cert. denied*, 520 U.S. 1274 (1997). Moreover, the ADA's administrative regulations define "mental impairment"

- 14 -

as "any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities." 29 C.F.R. § 1630.2(h)(2). "Depressive disorders would presumably fall under the category of emotional illness." *Gual v. AT&T Inc.*, 955 F.Supp. 346, 350 (D.N.J. 1997), *affirmed by*, 134 F.3d 576 (3rd Cir. 1998).

The Court finds that Garcia's deposition testimony presents enough evidence that his depression and related anxiety constitute mental impairments for purposes of establishing the first part of the disability inquiry.

**B. Impairment of Major Life Activity**

Garcia's Amended Complaint and Response to Qwest's Motion for Summary Judgment do not specifically identify the major life activity that his mental impairments allegedly substantially limit him from performing. His Response concludes that his "[m]edical records show that some or all of [his] major life activities have [been] severely impacted during any of the onsets of his mental illness." (docket # 46 at 5)  Because it is undisputed Garcia can walk, see, hear, and speak, the Court assumes Garcia's contention is his depression and anxiety substantially limit his ability to perform the major life activity of "working."

"Unfortunately, the ADA does not define the phrase 'major life activities.'" *Bragdon*, 524 U.S. at 659. Cases and regulations have established that the ADA's reference to "major life activities" are those activities of central importance to daily life.  *Toyota*, 534 U.S. at 197 (citing 45 CFR § 84.3(j)(2)(ii) (2001). The HEW Rehabilitation Act's regulations provide a list of examples of "major life activities" that includes "walking, seeing, hearing," and, as relevant in *Toyota*, "performing manual tasks."  *Id*. at 195 (citing 45 CFR § 84.3(j)(2)(ii) (2001)). The regulations further define "working" as a major life activity. 29 C.F.R. § 1630.2(I).

///

///

///

///

Although the Supreme Court has declined to directly answer whether working is a major life activity,[15] *Puckett v. Park Place Entertainment Corp*., 332 F.Supp. 1349, 1353 n. 3 (D.Nev. 2004), numerous courts in the Ninth Circuit have assumed working is a major life activity. This Court will make the same assumption. *Thornton*, 261 F.3d at 795 n. 1; *Puckett*, 332 F.Supp. at 1353; *Niimi-Montalbo v. White*, 243 F.Supp.2d 1109, 1122 n. 6 (D. Hawaii  2003); *McWilliams v. Latah Sanitation, Inc*., 554 F.Supp.2d 1165, 1171 (D. Idaho 2008).

Garcia has established the second prong of a *prima facie* case that the ADA covers the major life activity of working.

**C. Substantially Limits**

"In order to show a substantial limitation on [Garcia's] ability to work, [he] must demonstrate that his impairment significantly restricts 'the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.'" *Krocka*, 203 F.3d at 513 (quoting 29 C.F.R. § 1630.2(j)(3)(i)).  The Supreme Court in *Sutton* held that "the statutory phrase 'substantially limits' requires, at a minimum, that plaintiff allege he is unable to work in a broad class of jobs." *Sutton*, 527 U.S. at 491. An allegation that a plaintiff has difficulty working in his current job is not enough. *Id*. at 491; 29 C.F.R. § 1630.2(j)(3)(i) ("The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working."). "In determining whether an individual is substantially limited in a major life activity, the regulations instruct that the following factors should be considered: '[t]he nature and severity of the impairment; [t]he duration or expected duration of the impairment; and [t]he permanent or long-term impact, or the expected permanent or long-term impact of or resulting from the impairment.' " *Id*. at 196 (quoting §§ 1630.2(j)(2)(i)-(iii)). Thus, the question is not whether Garcia's mental impairment prevented him from being a sales and service consultant assisting

---

[15] The Supreme Court in *Bragdon* mentioned that the regulations provide a list of major life activities that are illustrative, not exhaustive, including "caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and *working* . . . ." 524 U.S. at 659 (emphasis added).

customers over the phone without a reasonable accommodation (assuming *arguendo* that totally removing such a consultant from the phone for a period of time was a reasonable accommodation). It is whether Garcia, at a minimum, was unable to work in a broad class of jobs. The Court answers this question adverse to Garcia.

Garcia has failed to establish he was substantially limited from the major life activity of working on or shortly after October 11, 2006 when he was terminated. In fact, "at least by the beginning of November, 2006," less than a month after his firing, Garcia was employed again on a full-time basis. (PSOF, Exhibit B; docket # 44-2 at 4)  As Qwest's Reply demonstrates, Garcia  was, and is, able to work in a wide array of jobs for a variety of employers (Checkmate, Drive Time Auto Sales, Bank of America) where he neither required nor requested an accommodation for his mental impairments to perform those jobs.  (docket # 49 at 6, citing DSOF ¶¶ 28, 29, 39, 41; PSOF, Exhibit B, p. 29)  Garcia's deposition testimony leads one to reasonably conclude that although he claimed he felt worse at the time of his March, 2008 deposition than when he was fired, the effects of his mental impairment were so mild that he has done well in his current job at Bank of America without any work restrictions and he has not sought or received any "professional" health care treatment in more than two years since his termination. He admits to not even researching whether his employee health insurance provides coverage for mental health treatment. (DSOF ¶¶ 34, 41, Exhibit A at 17; PSOF, Exhibit B at 6-8) Garcia attempts to explain away his failure to seek such treatment or look into such insurance coverage with his current employer, with whom he was employed for 14 months before his deposition, for fear his employer would use it against him. (PSOF, Exhibit B at 8; DSOF, Exhibit A at 14-15)  Nevertheless, he acknowledges that Bank of America has not given him any reason to "hold [it] against [him]" *Id*.

Qwest argues, and the Court agrees, that the short-term duration of Garcia's mental impairment (November, 2005 to January 31, 2006) does not qualify under the ADA as substantially limiting the major life activity of working in October, 2006 as a matter of law. Garcia has provided no admissible medical evidence that his mental impairments are permanent, long-term in duration or severe in nature (i.e., substantial when compared to the ability of "the

average person in the general population[,]" 29 C.F.R. § 1630.2(j)(1)(i)). Qwest points out that several courts have agreed that a temporary impairment or injury with minimal residual effects cannot be the basis for a sustainable claim under the ADA. *Sanders*, 91 F.3d at 1354 (psychological impairment for approximately 106 days with no residual effects was not of sufficient duration to fall within the protections of the ADA as a disability); *Blanton v. Winston Printing Co*., 868 F.Supp. 804, 808 (M.D.N.C. 1994) (holding that a temporary injury with minimal residual effects cannot be a basis for an ADA claim); *Johnson v. Foulds, Inc*., 1996 WL 41482 (N.D.Ill. 1996) (holding that temporary mental depression does not meet the requirements of a disability);  *Taylor v. Nimock's Oil Co*., 214 F.3d 957 (8th Cir. 2000) (heart disease recovery period did not qualify as substantial limitation on major life activity). Additionally, the appendix to the regulations states that "temporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities." 29 C.F.R. pt. 1630 app., § 1630.2(j).

Garcia has provided no admissible evidence that his single, 13-week episode of depression and anxiety, from which he recovered eight months before he was terminated, is a condition that is long-term or potentially long-term, indefinite or unknowable. Plaintiff has failed to establish a *prima facie* case that he has a disability within the meaning of the ADA.[16]

## **RETALIATION**

"Title IV of the ADA precludes retaliation against employees who seek to enforce their statutory rights under the ADA." *Head*, 413 F.3d at 1064 n. 54 (citing with approval *McNely v. Ocala Star-Banner Corp*., 99 F.3d 1068, 1073 (11th Cir. 1996)); *Freadman*

---

[16] Were the Court to have determined that Garcia established a *prima facie* claim of disability discrimination, the Court would have granted Qwest's summary judgment because Garcia failed to present adequate evidence to create a jury question of a pretext for disability discrimination in rebuttal of Qwest's legitimate, non-discriminatory reasons for Garcia's firing. *Coghlan v. American Seafoods Co. LLC*, 413 F.3d 1090, 1097-98 (9th Cir. 2005) (poor work performance is a legitimate, nondiscriminatory basis for an employment action). Garcia has not provided sufficient evidence to raise a genuine issue of material fact regarding the truth of Qwest's proffered nondiscriminatory reasons or "that a discriminatory reason more likely motivated." *Snead*, 237 F.3d at 1094.

*v. Metropolitan Property & Casualty Ins. Co.*, 484 F.3d 91, 106 (1st Cir. 2007). Title IV states that: "No person shall discriminate against *any individual* because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a) (emphasis added).

In order to prosecute an ADA retaliation claim, "a plaintiff bringing an ADA retaliation claim need not demonstrate that he has a disability." *Tabatchnik v. Cont'l Airlines*, 262 Fed. Appx 674, 676 & n. 1 (5th Cir. 2008) (citing *Krouse v. Am. Sterilizer*, 126 F.3d 494, 502 (3d Cir. 1997)). "Instead, a reasonable, good faith belief that the statute has been violated suffices." *Id.* (citing *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1264 (10th Cir. 2001)); *Sarno v. Douglas Ellliman-Gibbons & Ives, Inc.*, 183 F.3d 155 (2d Cir. 1999). "By its own terms, the ADA retaliation provision protects 'any individual' who has opposed any act or practice made unlawful by the ADA or who has made a charge under the ADA." *Krouse*, 126 F.3d at 502 (quoting 42 U.S.C. § 12203(a)). Therefore, Garcia's failure to prove an ADA disability does not preclude him from establishing a retaliation claim.

To establish a *prima facie* case of retaliation under the ADA, Garcia must show that (1) he engaged in a protected activity (such as requesting a disability accommodation), (2) he was thereafter subjected to an adverse employment action by his employer, and (3) there exists a causal link between the protected activity and the adverse employment action. *Porter v. California Dept. of Corrections*, 419 F.3d 885, 894 (9th Cir. 2005) (citing *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000)); *Hernandez v. Hughes Missile Systs. Co.*, 362 F.3d 564, 568 (9th Cir. 2004) (drawing on Title VII precedent to set out plaintiff's burden in ADA case). If Garcia provides sufficient evidence to show a *prima facie* case of retaliation, the burden then shifts to Qwest to articulate a legitimate, non-retaliatory reason for its actions. *McDonnell Douglas Corp.*, 411 U.S. at 801; *Guse v. Alhambra School Dist. 68*, 2007 WL 1810504 (D. Ariz. 2007). If Qwest sets forth such a reason, Garcia bears the ultimate burden of submitting evidence indicating that Qwest's proffered reason is merely a pretext for a retaliatory motive. *McDonnell Douglas Corp.*, 411 U.S. at 801; *Porter*, 419 F.3d at 894.

"[T]emporal proximity alone [of Garcia's termination]is sufficient to establish a genuine issue of material fact as to whether a causal link exists." *Arn v. News Media* 175 Fed.Appx. 844, 846 (9th Cir. 2006) (citing *Thomas v. City of Beaverton*, 379 F.3d 802, 812 (9th Cir. 2004) ("The causal link between a protected activity and the alleged retaliatory action 'can be inferred from timing alone' when there is a close proximity between the two.'"). Additionally, the employer's awareness of the protected activity is also important in establishing such a causal link. *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987).

Viewing the evidence in the light most favorable to Garcia as the Court must, the record contains sufficient evidence that Martinez knew (1) Garcia claimed to have a disability by Martinez' rude and insensitive remarks about his not having a disability and Garcia should quit, and (2) Garcia requested to be taken off the phones, especially after receiving Sloan-Farrell's written note Martinez specifically requested. Garcia testified he verbally informed Martinez on October 10, 2006 that he needed to be taken off the phones "because the pressure was and my anxiety and depression was (sic) just overwhelming, and I couldn't handle it." (PSOF, Exhibit B (Garcia's deposition) at 63-64, 73-77)  While Garcia's conversations with his supervisor, Martinez, that the pressure and stress were too high and he needed a break from the phones were vague, Garcia directly informed his employer, through Martinez, that he needed an accommodation (taken off the phones) for a week. Notwithstanding that Garcia did not have an ADA disability, his requests on October 10 and 11, 2006 for a reasonable accommodation is protected activity under the ADA. *McAlindin v. County of San Diego*, 192 F.3d 1226, 1238 (9th Cir. 1999). Having requested to be taken off the phones on the very same day he was terminated, the temporal proximity alone of Garcia's termination is sufficient to establish a genuine issue of material fact as to whether a causal link exists. The Court finds Garcia has established a *prima facie* case of unlawful retaliation under the ADA.

As previously mentioned, Garcia  was fired after a series of earlier warnings for tardiness, insubordination, unauthorized use of personal cell phone instead of taking calls from customers, lack of "professionalism, [poor] call handling and slam cram[,]"  DSOF, Exhibit N, Notice of Dismissal; Exhibit A at 109; Exhibits G, H, I, J, K, L, and M, and, finally, for violating

Qwest's Code of Conduct by using profanity in the workplace. (DSOF, ¶¶ 20-22) Although the Court finds Garcia established a *prima facie* case of retaliation, Qwest's Motion for Summary Judgement should still be granted because Garcia has failed to demonstrate a pretext "'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.' " *Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115, 1124 (9th Cir. 2000) (quoting *Tex. Dep't of Comty. Affairs v. Burdin*, 450 U.S. 248, 256 (1981)). When a plaintiff attempts to prove pretext with circumstantial evidence, as is the case here, he must do so with "specific" and "substantial" evidence "that tends to show that the employer's proffered motives were not the actual motives because they are inconsistent or otherwise not believable." *Godwin v. Hunt Wesson, Inc*., 150 F.3d 1217, 1222 (9th Cir. 1998)

## HOSTILE WORK ENVIRONMENT BASED ON DISABILITY

Finally, Garcia alleges a claim of harassment (Count II) in his Amended Complaint. (docket # 6 at 6)   He contends Qwest "subjected [him] to disability-related harassment when it created a hostile work environment and took adverse employment action against him because of his disability . . . ." *Id*.  Garcia's Amended Complaint and Response to Qwest's Motion for Summary Judgment do not clearly identify the specific "disability-related harassment" about which he complains.  To show disability harassment, Garcia's "Statement of Facts" alleges Martinez' comments: "People like you are f--king the company, you should do me and all of us a favor and quit. You don't have an (sic) disability, you are just a little girl get back to work" and "you need to quit acting like a little "chava" ("a Spanish offensive term for a woman"). (docket # 47 at 2-3)

As Qwest's Motion notes, Garcia's claim of disability harassment arising under the ADA has not been recognized in the Ninth Circuit. *Fowler v. Potter*, 2008 WL 2383073, * 9 (N.D. Cal. 2008) (citing *Brown v. City of Tucson*, 336 F.3d 1181, 1190 n. 14 (9th Cir. 2003) ("Our court has not yet held that a [disability harassment] claim exists, let alone what its source in the statute might be. We decline to do so here[.]"). *Brown* recognizes, however, other circuits have either decided there is such a claim grounded in 42 U.S.C. § 12112(a) or have assumed the

existence of such a claim, without expressly so holding. See, *Quiles-Quiles v. Henderson*, 439 F.3d 1, 5 n. 1 (1st Cir. 2006); *Jeseritz v. Potter*, 282 F.3d 542, 547 (8th Cir. 2002); *Walton v. Mental Health Ass'n*, 168 F.3d 661, 666-67 n. 2 (3d Cir. 1999); *Soledad v. Dep't of Treasury*, 304 F.3d 500, 506 (5th Cir. 2002); *Fox v. Gen. Motors Corp*., 247 F.3d 169, 176 (4th Cir. 2001); *Flowers v. S. Regional Physician Servs. Inc*., 247 F.3d 229, 232-33 (5th Cir. 2001).

Assuming *arguendo* an ADA disability [17] harassment claim under 42 U.S.C. § 12112(a) were recognized in this Circuit, like the 5th Circuit has in *Flowers*, a plaintiff must prove: (1) that he belongs to a protected group; (2) that he was subjected to unwelcome harassment; (3) that the harassment complained of was based on his disability or disabilities; (4) that the harassment was sufficiently pervasive or severe to affect a term, condition, or privilege of his employment; and (5) that the employer knew or should have known of the harassment and failed to take prompt, remedial action. *Flowers*, 247 F.3d at 236-237 (citations omitted). "Moreover, the disability-based harassment must 'be sufficiently pervasive or severe to alter the conditions of employment and create an abusive working environment.' " *Id*. at 237 (citations omitted). In determining whether a work environment is abusive, a court must consider the entirety of the evidence presented, including the frequency of the discriminatory conduct, its severity, whether it was physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance." *Id*.

The Court finds Garcia has produced insufficient evidence to show disability-based harassment sufficiently pervasive or severe to alter the conditions of his employment and create an abusive working environment. Garcia's testimony alleges two inappropriate, insulting and embarrassing comments made by Martinez on October 10 or 11, 2006 in front of other Qwest workers about Garcia and his disability: (1) "People like you are f--king the company, you should do me and all of us a favor and quit. You don't have an (sic) disability, you are just

---

[17] The Court further assumes without deciding that one need not have an ADA disability to obtain relief  for work-place disability harassment claim.

a little girl get back to work,"[18] (2) "[You don't] have a disability . . . I want to see a doctor's note if you're going to pull this . . . crap[,] " (PSOF, Exhibit B at 63-64; DSOF, Exhibit A at 63-64)  Garcia points to no other evidence in the record sufficient to show that *because of his alleged disability*, he was subjected to a workplace "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment[.]" *Flowers*, 247 F.3d at 236-237; *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) ("mere utterance of an epithet which engenders offensive feelings in an employee" does not create an objectively hostile or abusive work environment.); *Vasquez v. Co. of Los Angeles*, 349 F.3d 634 (9th Cir. 2004) (a supervisor who used two "racially-related epithets" did not create a hostile or abusive work environment); *Manatt v. Bank of Am., NA*, 339 F.3d 792, 799 (9th Cir. 2003)  (use of "two regrettable incidents" involving mockery of an Asian employee, "coupled with other offhand remarks made by [plaintiff's] co-workers and supervisor, did not alter the conditions of [plaintiff's] employment" because the incidents occurred over a span of two-and-a-half years).

Drawing an analogy to Title VII gender and race discrimination claims, Garcia must show discrimination "because of" his disability. *Flowers*, 247 F.3d at 236-237; *Fitzer v. Chevron Corp.*, 2006 WL 462552, *3 (E.D. Cal. 2006) (citing *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80-81 (1998)). Martinez' calling Garcia a "whiny little bitch" and an offensive Spanish name "chava" meaning woman;[19] Anthony Arriola's statement, "Don't talk to me. I don't talk to snitches" and other co-workers indirectly calling Garcia a "cry baby" and "whiny bitch" did not directly or indirectly address Garcia's disability. (PSOF, Exhibit B, at 78-79)  While the term "bitch" and "chava" have gender-specific connotations, these connotations do not establish that Martinez, by uttering these offensive words, harassed Garcia "because of"

---

[18] After extensive review of both parties' exhibits attached to their Statements of Facts, the Court is unable to find this quote in Garcia's deposition. It was only found in Garcia's unverified Amended Complaint, docket # 6 at ¶ 19, and unverified so-called Statement of Facts, docket # 47 at ¶ 11.

[19] *Id*. at docket ## 6 at ¶ 20 and 47 at ¶ 12-13.

his disability. *Martinez v. Mary's Woods at Marylhurst, Inc.*, 2006 WL 1360946 (D. Or. 2006) (citing *Galloway v. General Motors Service Parts Operations*, 78 F.3d 1164, 1168 (7th Cir. 1996), overruled in part on other grounds by *Morgan*, 536 U.S. 101 (calling someone a "bitch" fails to establish conclusively that such harassment "was motivated by gender rather than by a personal dislike unrelated to gender"); *Kriss v. Sprint Commc'ns Co., Ltd. P'ship*, 58 F.3d 1276, 1281 (8th Cir. 1995) (the word "bitch" fails to indicate "a general misogynist attitude," and is not "particularly probative of gender discrimination").

The evidence presented by Garcia falls far short of the severe conditions in cases where courts have allowed hostile work environment claims to proceed to trial. See, e.g., *Kang v. U. Lim Am., Inc.*, 296 F.3d 810, 817 (9th Cir. 2002) (finding hostile work environment where employer verbally and physically abused and threatened plaintiff because of his race); *Nichols v. Azteca Rest. Enters.*, 256 F.3d 864, 872-73 (9th Cir. 2001) (finding a hostile work environment where a male employee suffered abusive name-calling by co-workers and supervisors at least once a week and often several times a day over a period of years); *Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104, 1109 (9th Cir. 1998) (finding hostile work environment because the plaintiff's supervisor made repeated sexual remarks to her). Garcia's disability harassment claim fails and will also be dismissed.

Based on the foregoing,

**IT IS ORDERED** that Defendant Qwest's Motion for Summary Judgment, docket # 40, is **GRANTED**. The Clerk is hereby directed to enter Judgment in favor of Qwest and terminate this case.

DATED this 3rd day of December, 2008.

Lawrence O. Anderson
United States Magistrate Judge